UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JTH TAX, LLC *et al.*,

      Plaintiffs,

v.                                        Civil Action No. 2:20-cv-217

BABLU SHAHABUDDIN,

      Defendant.

<u>REPORT AND RECOMMENDATION</u>

This breach of contract case arises from a dispute between Plaintiffs JTH Tax, LLC d/b/a Liberty Tax Services ("Liberty") and SiempreTax+, LLC ("Siempre"), a tax preparation service, and their former franchisee, Bablu Shahabuddin ("Defendant" or "Shahabuddin"), regarding the assignment of certain leases ("Subject Locations") pursuant to a Purchase and Sale Agreement ("PSA"). On March 22, 2021, Shahabuddin filed a Motion for Summary Judgment, ECF No. 87. Shahabuddin asserts that (1) there is no evidence Plaintiffs requested assignment of the leases; (2) Plaintiffs waived their right to assignment of the leases; (3) Plaintiffs did not pursue their rights within a reasonable amount of time; (4) Plaintiffs' rights were extinguished by subsequent agreements; and (5) Plaintiffs have not established damages. Def.'s Mot. Summ. J. (ECF No. 87, at 1). Defendant also sought summary judgment on his counterclaim for monetary damages under

1

the terms of a related Settlement Agreement the parties signed in 2018. Id. On April 29, 2021, Plaintiffs filed their own Motion for Summary Judgment, ECF No. 107, asserting that they have established a breach of contract, did not waive their rights to assignment, and have adequate evidence of damages. Br. Supp. Pls.' Mot. Summ J. (ECF No. 108, at 6-11) ("Pls.' Br."). The cross-motions for summary judgment were both referred to me for a recommended decision under 28 U.S.C. § 636(b). Referral Order (ECF No. 117).

After reviewing both parties' motions and the exhibits in the summary judgment record, I find that even if Plaintiffs did request assignment of the Subject Locations, they waited an unreasonably long period to do so, and expressly waived their right to request the assignments in a timely fashion. Furthermore, under the plain language of the parties' agreements, Plaintiffs were required to pay Shahabuddin 10% of the 2019 Net Revenue, including revenue received from Electronic Filing Fees. Accordingly, I recommend that Defendant's Motion for Summary Judgment be GRANTED and Plaintiffs' Motion for Summary be DENIED.

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Shahabuddin was a long-time franchisee of the Plaintiffs, operating franchised Liberty locations in New York and other states. On June 30, 2016 the parties entered into an Agreement of Purchase and Sale ("PSA"), under which Shahabuddin

2

agreed to sell to Liberty certain assets used in his business, and
to assign specific leases.  Def.'s Br. Supp. Mot. Summ. J. ¶ 1
(ECF No. 88, at 2-3) ("Def.'s Br."); see also PSA (ECF No. 99-9,
at 2).  Section 8(e) of the PSA specifically represented and
warranted that:

> At Purchaser's [Liberty's] request, Seller [Shahabuddin]
> shall seek the Lessor's consent to the assignment of certain
> office real estate leases connected with the operation of the
> Business to Purchaser or its assignees as Listed in Schedule
> C and subject to the terms therein.  Notwithstanding the
> forgoing, [sic.] to the extent any leases associated with
> Business have not been assigned to Purchaser and Purchaser
> requests such assignment, Seller agrees to assign such leases
> to Purchaser immediately.  The Seller warrants that all leases
> associated with the Business are valid and in full force and
> the effect and enforceable in accordance with their terms,
> and are clear of any liens whatsoever.  The Seller further
> warrants that all leases associated with the Business are
> valid and in full force and effect and enforceable in
> accordance with their terms, and are clear of any liens
> whatsoever.  The Seller further warrants that Seller has not
> received any notice of, and there is no existing event of
> default, and all rents due under the lease agreements are
> current as of the date of Closing, except for June rent.  If
> a Lessor consents to assignment, Seller's failure to assign
> such leases to Purchaser, provide leases free and clear of
> any and all liens or failure to endure that all rents are
> current as of closing, shall render the Purchase Price void
> and no amounts shall be due or owning from Purchaser to Seller
> for the Purchase Price.  This paragraph in no way obligates
> Purchaser to assume any of Seller's obligations under any
> lease, including but not limited to, those office locations
> listed in Schedule C.

Def.'s Br. ¶ 2 (ECF No. 88, at 3) (quoting PSA ¶ 8(e) (ECF No. 99-
9, at 5-6)).  Under the terms of the PSA, the representations and
warranties in section 8 were "deemed to have been given upon the
execution of this Agreement and upon the Closing Date."  PSA ¶ 8

(ECF No. 99-9, at 6). The PSA defined "Closing Date" as "upon Seller's delivery to the Purchaser of an executed copy of this Agreement and all of the Assets via a Bill of Sale and Assumption and Assignment forms and Purchaser's acceptance in Virginia by Purchaser's authorized officer." Def.'s Br. ¶ 3 (ECF No. 88, at 3) (quoting PSA ¶ 6 (ECF No. 99-9, at 4)).

The PSA also stated that the Seller (Shahabuddin) was to receive a down payment plus a percentage of "Net Revenue" generated by the "those locations listed in Schedule C and/or requested by Purchaser to be assigned and which are secured by Purchaser through assignment of the lease" for Fiscal Years 2017-2019. PSA ¶ 2 (ECF No. 99-9, at 2-3); see also Def.'s Br. ¶ 1 (ECF No. 88, at 2-3). "Net Revenue," as defined in the PSA, included "gross fees received less all discounts, Cash-in-a-Flash, Send-a-Friend, and uncollected fees for the offices in the Territories." PSA ¶ 1 (ECF No. 99-9, at 2); see also Def.'s Br. ¶ 6 (ECF No. 88, at 4).

Furthermore, the agreement stated that "no modification of this Agreement shall be binding unless in writing and signed by each of the Parties hereto." PSA ¶ 19 (ECF No. 99-9, at 10); see also Pls.' Br. ¶ 5 (ECF No. 108, at 2).[1] Liberty sent Shahabuddin the fully executed PSA on July 1, 2016. Def.'s Br. ¶ 4 (ECF No. 88, at 4); id., Ex. 1 (ECF No. 88-1, at 1). Plaintiffs assert

---

[1] Plaintiffs' brief contains a typographical error, as it cites to Paragraph 9 rather than Paragraph 19. Pls.' Br. ¶ 5 (ECF No. 108, at 2).

that no subsequent modifications have occurred.  Pls.' Br. ¶ 6 (ECF No. 108, at 3).  Defendant, in contrast, argues that both a later Settlement Agreement and five License Agreements related to the Subject Locations modified the PSA.  Def.'s Br. Opp'n to Pls.' Mot. Summ. J. ¶ 6 (ECF No. 113, at 3) ("Def.'s Opp'n").

The dispute in this court involves Liberty's claim that Shahabuddin breached the PSA more than three years after the Closing Date by refusing to assign Leases to the following locations ("Subject Locations") to Liberty:

- 252 Willis Ave., Bronx, NY 10459

- 462 East Fordham Road, Bronx, NY 10458

- 2168A Westchester Ave., Bronx, NY 10461

- 750 Allerton Ave., Bronx, NY 10467

- 2104 Adam Clayton Powell Blvd., New York, NY 10026 (a/k/a 201-209 W. 125th Street, New York, NY 10026)

Def.'s Br. ¶ 5 (ECF No. 88, at 4); Pls.' Br. ¶ 8 (ECF No. 108, at 3).  Three of these locations—252 Willis Ave., 462 East Fordham Road, and 216A Westchester Ave.—were listed on Schedule C of the PSA.  See PSA, Schedule C (ECF No. 99-9, at 16).  Plaintiffs allege that they asked Defendant to assign the leases for all Subject Locations in December 2019, but Defendant refused.  Pls.' Br. ¶ 8 (ECF No. 108, at 3).  Defendant, however, asserts that "Plaintiffs

can point to no evidence that they demanded assignment of any leases from Defendant." Def.'s Opp'n ¶ 8 (ECF No. 113, at 3).

Shahabuddin's summary judgment motion relies on documents exchanged at the time of Closing in 2016, which establish that Liberty would not seek assignment of the leases for the Subject Locations. On July 20, 2016, Plaintiffs informed Defendant's counsel that "Corp not taking lease" for 2304 Adam Clayton Powell Blvd.[2] and 2168a Westchester Ave. Def.'s Br., Ex. 3 (ECF No. 88-3, at 3). Defense counsel asked if these decisions were final and "should Bablu proceed to dispose of the leases?" Id. at 2. In response, Plaintiffs' counsel replied, "Yes, we are not moving forward with these. As per the Agreement, Bablu should make arrangements to transfer equip and customer files/info to us." Id.

On August 19, 2016, Defendant's counsel emailed counsel for Plaintiffs confirming that Liberty was not taking 2304 Adam Clayton Powell Blvd. or 2168a Westchester Ave. Id., Ex. 4 (ECF No. 88-4, at 2). Defendant also stated that with regard to other properties not on Schedule C, "[w]e understand that Liberty does not want any of the properties that were not on Schedule C, and that Bablu should dispose of them. Please let me know if there

---

[2] This address is similar to 2104 Adam Clayton Powell Blvd., but is not one of the Subject Locations at issue in this litigation. Def.'s Br. ¶ 10 n.1 (ECF No. 88, at 5).

are any that it is interested in getting assignments on." Id.  On August 22, 2016, Plaintiffs' counsel replied, "I am not aware of any other leases Liberty wants to acquire, but will confirm with our leasing team." Id., Ex. 5 (ECF No. 88-5, at 1). Plaintiffs' counsel also noted that they were "working to get these assignments as quickly as possible" and that "I believe you'd agree that it's in all parties' interest to get these assignments finalized soon." Id.  With regard to specific properties at issue she explained, "462 E Fordham Rd., Bronx – Landlord informed there's also a tax issue on this property.  We are investigating" and "252 Willis Ave, Bronx (understand there is an issue on taxes, does Liberty Still want this location) No decision has been made yet.  We are still investigating." Id.  On November 16, 2016, Plaintiffs' counsel informed Defendant's counsel that it was "not taking" either the 462 E. Fordham Rd. or 252 Willis Ave. locations. Id., Ex. 6 (ECF No. 88-6, at 2); see also id., Ex. 2, Hewitt Aff. ¶ 11 (ECF No. 88-2, at 2).  Thus, as to three of the five Subject Locations (2168a Westchester Ave., 462 E. Fordham Rd., and 252 Willis Ave.), Shahabuddin has email correspondence confirming the company did not intend to request assignment.  The other two locations (750 Allerton Ave. and 2104 Adam Clayton Powell Blvd.) were not on Schedule C.

    In addition to email correspondence, Shahabuddin relies on an affidavit from a former Chief Executive Officer of Liberty, John

T. Hewitt ("Hewitt").   Id. ¶ 7 (ECF No. 88, at 4); id., Ex. 2,
Hewitt Aff. ¶¶ 4-5 (ECF No. 88-2, at 1).   In his sworn affidavit,[3]
Hewitt stated that he "executed and ha[d] personal knowledge of
the terms of the Purchase and Sales Agreement ("PSA") with Bablu
Shahabuddin dated June 30, 2016" and of "Liberty's decision to .
. . decline to take assignment of the leases associated with the
franchises in the PSA."   Id., Ex. 2, Hewitt Aff. ¶ 5 (ECF No. 88-
2, at 1).   Notably, Hewitt swore that:

> In July of 2016, the Company made the determination, based on
> all available evidence at the time, that it was in the best
> interest of the Company NOT to require assignment of the
> leases for franchise with the following addresses: 2304 Adam
> Clayton Powell Blvd, New York, NY 10030 [and] 2168a
> Westchester Ave, Bronx, NY 10462.
>
> In November of 2016, the Company made the determination, based
> on all available evidence at the time, that it was in the
> best interest of the company NOT to require assignment of the
> leases with the following addresses: 462 E. Fordham Road,
> Bronx, NY 10458 [and] 252 Willis Avenue, Bronx, NY 10454.

Id. ¶¶ 10-11.   Hewitt also stated that:

> Once the Company decided not to request assignment of the
> leases for these properties or any others identified in the
> PSA, it did not expect Mr. Shahabuddin to keep them available
> for assignment indefinitely in the future. As I recall, the
> Company did not want to undertake the ongoing financial
> liability associated with these properties.   I, acting on
> behalf of the Company, did not believe the PSA required Mr.
> Shahabuddin to make available leases for assignment to the
> Company in perpetuity especially after the Company expressly
> declined to take assignment of the leases.

---

[3] Plaintiffs contested the admission of Hewitt's affidavit, arguing that it was
obtained via ex parte communication by Defendant's counsel and in violation of
attorney-client privilege.   Pls.' Mot. to Strike Hewitt Aff. (ECF No. 109).
The Court denied Plaintiff's Motion to Strike the Affidavit of John Hewitt.
(ECF No. 119).

<u>Id.</u> ¶ 12.

Shahabuddin later filed a civil action regarding payments due to him under the PSA.  On November 9, 2018, Shahabuddin and Liberty executed a Settlement Agreement in that case.  Settlement Agreement (ECF No. 99-10, at 2).   Under the terms of the Settlement Agreement, Liberty was to pay Shahabuddin $775,000 within 72 hours of execution of the agreement and "make payment to Shahabuddin of 10% of the 2019 Net Revenue identified in the updated Exhibit A required in Paragraph 1.B on or before July 31, 2019." <u>Id.</u> ¶ 1.C. (ECF No. 99-10, at 3).  "Net Revenue," as an undefined term in the Settlement Agreement, was defined by the PSA.   <u>Id.</u> ¶ 1.B.; PSA (ECF No. 99-9, at 2) ("Net Revenue as used herein shall mean gross fees received less all discounts, Cash-in-a-Flash, Send-a-Friend, and uncollected fees . . . ."); <u>see also</u> Def.'s Br. ¶ 21 (ECF No. 88, at 7).  The Settlement Agreement also included the following provision:

> This Agreement states the entire agreement amongst the Parties who have executed this Agreement and supersedes their prior agreements, negotiations or understandings, both oral and written, including the New York Agreement . . ., except for Sections 4, 6(a), 7(a), 7(b), 7(c), 7(e), 7(f), 8, 10(a), 10(g), 10(i), 10(j), the first sentence of 10(k), 11, 13, 14, and 16 of the New York Agreement.

Settlement Agreement ¶ 4.A. (ECF No. 99-10, at 4).  Liberty also warranted that it was "not aware of any event or condition giving rise to a claim of offset against Shahabuddin pursuant to the

surviving terms above." Id.; see also Def.'s Br. ¶ 22 (ECF No. 88, at 7).

On July 30, 2019, Liberty paid Shahabuddin $311,992.65, pursuant to the Settlement Agreement's requirement that they pay Defendant 10% of Net Revenue from July 1, 2018 to June 30, 2019. Def.'s Br. ¶ 24 (ECF No. 88, at 7). Defendant alleges that this payment failed to include 10% of the revenue generated by "Electronic Filing Fees" during this time period. Id. Plaintiffs do not contest this fact, but assert that they are not liable to Defendant "for revenue derived from a product developed and implemented following their entering into the PSA." Pls.' Mem. Opp'n to Def.'s Mot. Summ. J. ¶ 24 (ECF No. 99, at 5) ("Pls.' Opp'n"); see also Def.'s Br. ¶ 25 (ECF No. 88, at 7) ("Plaintiffs' Vice President of Treasury, Daniel Brashier ('Mr. Brashier'), asserted that Shahabuddin was not entitled to 10% of the revenue generated for Electronic Filing Fees because such fees were not a product that existed at the time the parties negotiated and signed the PSA." (citing Brashier Tr. 106:16-25; 107:1-2 (ECF No. 88-10, at 21-22))).

In December of 2019—more than three years after the PSA was executed—Plaintiffs allege they first requested that Defendant transfer the leases of the Subject Locations to Plaintiffs. Def.'s Br. ¶ 26 (ECF No. 88, at 7) (citing id., Ex. 11, Pls.' Answers to Shahabuddin's Interrogatories 1 & 3 (ECF No. 88-11, at 1-2); id.,

Ex. 10, Brashier Tr. 36:13-19 (ECF No. 88-10, at 4)).   Daniel
Brashier ("Brashier"), Liberty's Vice President of Treasury,
testified during his deposition that he spoke with John  Horgan
("Horgan"), then-counsel for Shahabuddin, on December 19, 2019,
but did not know whether they conversed about the PSA.   Id., Ex.
10, Brashier Tr. 43:7-23, 44:22-24 (ECF No. 88-10, at 5-6).
Brashier also testified that he spoke with Horgan the week of
Friday, December 27, 2019, but was "not certain" if the PSA was
discussed or whether he told Horgan that Shahabuddin would be in
breach of the PSA if he did not assign the leases to Plaintiffs.
Id. 45:5-18 (ECF No. 88-10, at 7).   Brashier did, however, state
that Horgan told him that the Defendant would refuse to assign
leases for the Subject Locations to Plaintiffs.   Pls.' Opp'n, Ex.
D, Brashier Tr. 45:19-22 (ECF No. 99-4, at 10).

On January 7, 2020, Plaintiffs and Defendant* entered into
five License Agreements for the Subject Locations, which allowed
Liberty to occupy the premises from January 1 through April 30,
2020.   Def.'s Br. ¶ 33 (ECF No. 88, at 10) (citing id., Ex. 10,
Brashier Tr. 65:14-66:10 (ECF No. 88-10, at 14-15)); Pls.' Br. ¶
15 (ECF No. 108, at 4) (citing id., Ex. F, License Agreements (ECF
No. 108-6, at 2-21)).   According to Brashier, Shahabuddin would
not allow Plaintiffs a license to occupy beyond April 30, 2020.

---

* The License Agreements are between JTH Tax, LLC and various entities associated
with the properties, but Shahabuddin signed all of them as representative for
each licensor—presumably the Shahabuddin-entity with the individual leasehold.

Def.'s Br., Ex. 10, Brashier Tr. 70:3-71:6, 81:3-11 (ECF No. 88-10, at 16-18). Each agreement included the following provision:

> This License Agreement contains the entire agreement between the parties hereto and supersedes all prior agreements or understandings between the parties hereto relating to the subject matter hereof; any agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this License Agreement, in whole or in party, unless such agreement is in writing and signed by the party against which enforcement of the change, modification, discharge or abandonment is sought.

See Pls.' Br., Ex. F, License Agreements (ECF No. 108-6, at 2-21). Plaintiffs assert that they entered into these agreements "to avoid disruption to their business at the subject locations" and that "Defendant was to assign the leases to the Plaintiffs" following the termination of the License Agreements. Id. ¶ 15 (ECF No. 108, at 4). Although not part of the record on summary judgment, at oral argument in response the Court's questioning, it was revealed that another Liberty franchisee, identified by name in certain exhibits, had sublet the Subject Locations after Liberty declined to take assume the leases under the PSA.

On March 17, 2020, Plaintiffs filed a Complaint in the Southern District of New York against Shahabuddin and others, who have since been dismissed. Compl. (ECF No. 1); see also Def.'s Br. (ECF No. 88, at 1). On March 23, 2020, Plaintiffs filed their First Amended Complaint, which, among other claims, sought a preliminary injunction. Am. Compl. (ECF No. 4). Plaintiffs' First Amended Complaint alleged that "[r]ather than transfer the Leases

12

[for the Subject Locations] to Plaintiffs, Shahabuddin has advised that he intends to prevent Plaintiffs from continuing to offer tax preparation services at the Subject Locations at the expiration of the License Agreements." Def.'s Br. ¶ 34 (ECF No. 88, at 10) (quoting Am. Compl. ¶ 6 (ECF No. 4, at 3)).

On April 29, 2020—the day before the expiration of the License Agreements—the case was transferred to this court and Plaintiffs filed an Emergency Motion for Temporary Restraining Order seeking a preliminary injunction allowing Plaintiffs to remain in the Subject Locations and requiring Defendant to assign the leases for the Subject Locations to Plaintiffs. Pls.' Br. ¶ 13 (ECF No. 108, at 3-4); see also Emergency Mot. Temporary Restraining Order (ECF No. 37). The Court denied this motion. Mem. Order (ECF No. 55).*

Lastly, the parties contest whether Plaintiffs have sustained damages as a result of not receiving leases to the Subject Locations. Defendant asserts that Plaintiffs' claims for damages rely solely on their expert, Stephen A. Purdy ("Purdy"), a certified public accountant. Def.'s Br. ¶ 39 (ECF No. 88, at 10). Defendant objects that Purdy's initial expert report calculated damages from 2016, not 2019 when Plaintiffs allege the breach occurred, and that Purdy failed to allocate damages between

---

* Plaintiffs also filed a Motion for Order to Show Cause for Temporary Restraining Order and Preliminary Injunction in the Supreme Court of the State of New York, Bronx County on July 23, 2020. Pls.' Br. ¶ 13 (ECF No. 108, at 3-4); id., Ex. B (ECF No. 108-2).

multiple causes, including Shahabuddin's alleged failure to turn over customer lists. Id. ¶¶ 40-42 (ECF No. 88, at 11). Defendant argues that any obligation to turn over customer lists did not survive the Settlement Agreement. Id. ¶ 43 (ECF No. 88, at 12). Plaintiffs allege that their damages are demonstrated by Purdy's opinion, as well as Brashier's affidavit and deposition testimony; a Historical Trend Analysis of fees for the Subject Locations for FY2012-2020; and section 7(e) of the PSA, which states that Shahabuddin is liable for the "[c]ost of investigation and/or defense of any action or claim by any person, party, or authority, which arises or is a result of the [his] ownership or operation of the Business, including but not limited to, employee, attorney, consultant, investigative, and press/public relations related fees." Pls.' Opp'n ¶ 39 (ECF No. 99, at 6-7); Pls.' Br. ¶ 17 (ECF No. 108, at 4-5).

## II. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for

14

the non-moving party." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp.. 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." Anderson, 477 U.S. at 252. Rather, when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods.. Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary

15

judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). And in considering each individual motion, the court must again resolve factual disputes and rational inferences drawn therefrom in the light most favorable to the party opposing that motion. Id.

### III. RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

From the parties' briefs and the hearing held on June 18, 2021, it is clear that there is no genuine dispute as to any fact material to the resolution of Plaintiffs' and Defendant's claims. As outlined below, and based on the record before the Court, Defendant has shown that it did not breach the PSA as Plaintiffs waived their rights to assignment of leases for the Subject Locations. Additionally, Plaintiffs breached the parties' agreements by failing to compensate Shahabuddin for the undisputed amount of $43,032.20 in "Electronic Filing Fees," which were not excluded from the calculation of 10% of all 2019 Net Revenue.

16

Conversely, Plaintiffs have established no breach of the PSA sufficient to support any claim for damages. Contrary to Plaintiff's argument, the PSA did not include an indefinite right to demand assignment of leases three years after the Closing Date. As a result, it is not necessary to evaluate their various hypothetical damage evidence offered to supplement Purdy's plainly unreliable damages testimony.

**A. Defendant Was Not Required to Assign the Leases to the Subject Locations to Plaintiffs in December 2019.**

Having reviewed the summary judgment record before the Court, I conclude that even if Plaintiffs did request assignment of the leases for the Subject Locations, they did not do so until December 2019. By this point, Plaintiffs had waived their right to the Subject Locations both expressly and by the passage of an unreasonable amount of time.

**1. Plaintiffs Supply Only Vague Evidence that They Requested Assignment of the Leases for the Subject Locations.**

To establish a breach of contract claim, Plaintiffs must show that Defendant "(1) had a legally enforceable obligation, (2) materially breached that obligation, and (3) such breach caused plaintiff damage." Best Med. Int'l v. Tata Elxsi Ltd., No. 1:10-cv-01273 (IDD), 2011 U.S. Dist. LEXIS 134247, at *31 (E.D. Va. Nov. 21, 2011) (citing Filak v. George, 267 Va. 612, 619 (2004)). Plaintiffs in this case assert that they have established a breach of contract claim against Defendant. Pls.' Opp'n (ECF No. 99, at

17

12-14); Pls.' Br. (ECF No. 108, at 6-8).  But Defendant argues
that Plaintiffs cannot establish Defendant materially breached the
contract, since "there is no evidence that Shahabuddin was under
a legal obligation to assign the lease." Def.'s Br. (ECF No. 88,
at 16).

First, it is uncontested that Defendant originally had a
legally enforceable obligation to assign certain leases under the
PSA.  Paragraph 8(e) of the PSA, in relevant part, states:

> At Purchaser's request, Seller shall seek the Lessor's
> consent to the assignment of certain office real estate leases
> connected with the operation of the Business to Purchaser or
> its assignees as Listed in Schedule C and subject to the terms
> therein.  Notwithstanding the forgoing, to the extent any
> leases associated with Business have not been assigned to
> Purchaser and Purchaser requests such assignment, Seller
> agrees to assign such leases to Purchaser immediately.

PSA ¶ 8(e) (ECF No. 99-9, at 5-6).  In other words, Shahabuddin
had a legally enforceable obligation to assign leases to Plaintiffs
if they requested them.

Plaintiffs repeatedly assert that they requested Shahabuddin
sign over the leases for the Subject Locations in a variety of
manners, the earliest of which was during a phone conversation
between Brashier and Defendant's counsel the week of Friday,
December 27, 2019.  See, e.g., Pls.' Opp'n (ECF No. 99, at 13);
Pls.' Br. (ECF No. 108, at 9); Pls.' Opp'n, Ex. D, Brashier Tr.
44:12-45:22 (ECF No. 99-4, at 9-10).  In support of this assertion,
Plaintiffs point to Brashier's deposition testimony and affidavit

in support of their Amended Complaint,[4] their New York Motion, and Shahabuddin's deposition testimony. Pls.' Opp'n (ECF No. 99, at 13) (citing id., Exs. D, E, F, & K); Pls.' Br. (ECF No. 108, at 9) (citing id., Exs. C, D, B, & E). Yet none of these allegedly supporting documents establish that Plaintiffs requested assignment of the Subject Locations pursuant to the PSA. While Brashier swore that the contents of the Amended Complaint were true based on his knowledge, and information and belief, the Amended Complaint merely states that sometime "[a]fter the parties entered into the PSA, Plaintiffs requested that Shahabuddin transfer the Leases to Plaintiffs" and that Shahabuddin refused. Am. Compl. ¶¶ 28-29 (ECF No. 4, at 6). Likewise, the New York Motion again generally alleges that "Shahabuddin refused Plaintiff's request for the leases in December 2019. Pls.' Opp'n, Ex. F (ECF No. 99-6, at 4). Shahabuddin's cited testimony also does not establish that Plaintiffs' requested the leases to the Subject Locations in 2019, only that ATAX was currently operating at all five locations in question. Id., Ex. K, Shahabuddin Tr. 92:8-11 (ECF No. 99-11, at 9). At best, Brashier testified during his deposition that he had a conversation with Defendant's then-

---

[4] The document Plaintiffs attached to their motion is Brashier's affidavit attesting to the veracity of Plaintiffs' Amended Complaint. However, the record also contains an Affidavit of Daniel Brashier in Support of Plaintiffs' March 24, 2020 Motion for Temporary Restraining Order. Brashier's Reply Aff. Supp. Mot. Temporary Restraining Order (ECF No. 33) ("Brashier's Reply Aff.").

attorney Horgan the week of Friday, December 27, 2019.  But
Brashier could not say whether they discussed the PSA or if he
specifically demanded assignment of the Subject Location leases,
only that Horgan said Shahabuddin would not assign the leases to
Liberty.  Id., Ex. D, Brashier Tr. 44:12-45:22 (ECF No. 99-4, at
9-10). In sum, the sole evidence supplied by Plaintiffs that they
formally requested assignment of the leases in December 2019 is
Brashier's vague testimony, which makes no mention of the PSA or
the Settlement Agreement.  A separate affidavit from Brashier, ECF
No. 33, which Plaintiffs did not cite in their summary judgment
pleadings states, that "[i]n December 2019, [he] spoke with John
Horgan of Ellenoff Grossman & Schole LLP ("Mr. Horgan"), counsel
for Shahabuddin.  During that call, I formally demanded that Mr.
Shahabuddin assign leases for the Subject Locations."  Brashier's
Reply Aff. ¶ 8 (ECF No. 33, at 2).  But this affidavit likewise
makes no mention of the PSA, nor does Brashier allege any basis
for the claim asserted here—namely that Shahabuddin's failure to
assign the leases would breach the PSA.  This is not surprising as
the PSA was over three years old and during the intervening period
Liberty's relationship with all five locations was with a different
franchisee.  Even assuming that Brashier did formally request
assignment of the leases for the Subject Locations in December
2019, Plaintiffs had already waived their right to request
assignment of the leases.

**2. Plaintiffs Waived Their Right to Assignment of the Leases Both Expressly and by Not Pursing That Right Within a Reasonable Amount of Time.**

"Waiver is the voluntary, intentional abandonment of a known legal right. It has two essential elements: (1) knowledge of the facts basic to the exercise of the right, and (2) the intent to relinquish that right." Bergmueller v. Minnick, 383 S.E.2d 722, 725 (Va. 1989) (citing Fox v. Deese, 362 S.E.2d 699, 707 (Va. 1987)).  Both elements are necessary to establish waiver.  Id. Waiver does not have to be express, but can be inferred from the waiving party's conduct.  Woodmen of World Life Ins. Soc'y v. Grant, 38 S.E.2d 450, 454 (Va. 1946); see also Bernsen v. Innovative Legal Mktg., LLC, 885 F. Supp. 2d 830, 833 (E.D. Va. 2012) (quoting Perry Eng'g Co. v. AT&T Comm'cns, Inc., No. 92-2050, 1993 U.S. App. LEXIS 17432, at *13 (4th Cir. July 13, 1993)).

Here, Defendant asserts that Plaintiffs expressly waived their right to assignment of the leases through their communications with the Defendant, and later failure to demand assignment for over three years.  Def.'s Br. (ECF No. 88, at 16-19).  Plaintiffs allege that they did not waive their right to the leases, as the parties did not modify the PSA via a signed writing and "[t]he PSA does not give a time limit as to when Plaintiffs can request the assignment of the leases."  Pls.' Opp'n (ECF No. 99, at 14); Pls.' Br. (ECF No. 108, at 8-9); Pls.' Reply to Response to Pls.' Mot. Summ. J. (ECF No. 115, at 12) ("Pls.' Reply").  They

21

also assert that they have continued to pursue their rights as evidenced by this lawsuit.  Pls.' Opp'n (ECF No. 99, at 15-16); see also Pls.' Br. (ECF No. 108, at 9).[5]  Plaintiffs' arguments are unpersuasive.

Plaintiffs expressly waived their right to obtain leases to the Subject Locations listed in Schedule C when they repeatedly told Shahabuddin that they would not be taking them and replied affirmatively that he was free to dispose of such leases.  See, e.g., Def.'s Br., Ex. 3 (ECF No. 88-3, at 2-3); id., Ex. 4 (ECF No. 88-4, at 7); id., Ex. 6 (ECF No. 88-6, at 2); see also id., Ex. 2, Hewitt Aff. ¶¶ 10-12 (ECF No. 88-2, at 2).  On July 20, 2016 Liberty informed Defendant's counsel that it was not taking the leases for two properties listed on Schedule C—2304 Adam Clayton Powell Blvd. and 2168a Westchester Ave.  Def.'s Br., Ex. 3 (ECF No. 88-3, at 2-3); see also id., Ex. 2, Hewitt Aff. ¶ 10 (ECF No. 88-2, at 2).  And, on November 16, 2016, Plaintiffs' counsel informed Defendant that it was not taking either the 462 E. Fordham Rd. or 252 Willis Ave. locations, which were also listed on Schedule C.  Id., Ex. 6 (ECF No. 88-6, at 2); see also id., Ex. 2, Hewitt Aff. ¶ 11 (ECF No. 88-2, at 2).  Furthermore, Defendant specifically asked whether Plaintiffs were interested in any

---

[5] Plaintiffs also argue that Hewitt's affidavit should be disregarded in its entirety.  Pls.' Opp'n (ECF No. 99, at 16).  As the Court has already addressed the admissibility of Hewitt's affidavit in a separate order, I decline to do so again.

properties not on Schedule C, stating, "We understand that Liberty does not want any of the properties that were not on Schedule C, and that Bablu should dispose of them. Please let me know if there are any that it is interested in getting assignments on." Id., Ex. 4 (ECF No. 88-4, at 2). Plaintiffs' counsel replied on August 22, 2016, "I am not aware of any other leases Liberty wants to acquire, but will confirm with our leasing team." Id., Ex. 5 (88-5, at 1). The record does not show that Plaintiffs' counsel subsequently requested any additional properties in 2016. As Plaintiffs had already reiterated that Shahabuddin was free to dispose of leases they choose not to take, the email correspondence between the parties establishes that Plaintiffs waived their right to obtain assignment of the five Subject Locations in 2016.

Plaintiffs argue that the correspondence between the Defendant and themselves was not an effective waiver, as the PSA includes a provision requiring that modifications must be in a writing signed by both parties. Pls.' Opp'n (ECF No. 99, at 15-16); see also PSA ¶ 19 (ECF No. 99-9, at 10-11). But a waiver is not a modification. Waiver only requires the waiving parties to know their rights and intend to relinquish them. See Woodmen of World Life Ins. Soc'y v. Grant, 38 S.E.2d 450, 454 (Va. 1946). A party can make a waiver expressly or impliedly through conduct, acts, or a course of dealing. Id. Here, the parties do not dispute that Plaintiffs were aware of their right to obtain

assignment to the Subject Locations.  Thus, the question is whether Plaintiffs intended to waive that right.   Their correspondence with Defense counsel in 2016 shows that they did.  But even if the 2016 correspondence between the parties did not constitute a waiver of Plaintiffs' rights, Plaintiffs subsequently waived any right to the Subject Locations by failing to request assignment of the leases to these locations within a reasonable time.

"As a general principle of contract law, when a contract is silent regarding the time of performance, the time of performance will be deemed to be within a reasonable time after the execution of the agreement." F. L. Hall, Inc. v. Warehouse Landing Assocs., 38 Va. Cir. 181, 183 (Cir. Ct. 1995).   In determining what constitutes a reasonable time, the circumstances to consider include "the nature of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade." Id. (quoting Restatement (Second) of Contracts § 41 cmt. b).  Overall, "the question is what time would be thought satisfactory to the offeror by a reasonable man in the position of the offeree . . . . " Id.  (quoting Restatement (Second) of Contracts § 41 cmt. b).  Additionally:

> The more significant the risk, the greater is the need for limitation, and hence the shorter is the time which is reasonable . . . . A reasonable time for acceptance in a speculative transaction is brief not only because the offeror does not intend to assume an extended risk without compensation but also because he does not intend to give the

offeree an extended opportunity for speculation at the offeror's expense.

Id. (quoting Restatement (Second) of Contracts § 41 cmt. f); see also Portsmouth Redevelopment & Hous. Auth. v. Ison, 66 Va. Cir. 336, 366-67 (Cir. Ct. 2005). Generally, what constitutes a reasonable amount of time is a factual issue for a jury. Grossmann v. Saunders, 376 S.E.2d 66, 70 (Va. 1989). But "in an appropriate case a court may award summary judgment when, as a matter of law, a reasonable date for performance has passed." Little v. Quin Rivers, Inc., No. 3:15-cv-20, 2015 WL 4363201, at *1 (E.D. Va. July 14, 2015); see also Perry Eng'g Co. v. AT&T Commc'ns, Inc., No. 92-2050, 1993 U.S. App. LEXIS 17432, at *15 (4th Cir. July 13, 1993) ("[I]ssues such as reasonableness . . . normally reserved to a jury may be resolved as a matter of law where only one conclusion may reasonably be drawn from the evidence." (citation omitted)).

Here, both the language of the contract and the parties' actions establish that decisions regarding the assignment of leases were to take place shortly after the execution of the PSA in 2016, and as a matter of law, long before December 2019. Under the PSA, the Closing Date was to occur "upon Seller's delivery to the Purchaser of an executed copy of this Agreement and all of the Assets via a Bill of Sale and Assumption and Assignment forms and Purchaser's acceptance in Virginia by Purchaser's authorized officer." PSA ¶ 6 (ECF No. 99-9, at 4) (emphasis added). Thus,

when the parties closed in 2016, all assets, including leases, should have been transferred to Plaintiffs. Liberty also "agree[d] to pay June rent directly to landlords for those locations which [were] secured by [them] through assignment of the lease." Id. ¶ 6.a. Such a provision only makes sense if the parties intended the leases to be assigned to Plaintiffs in the summer of 2016. Likewise, Plaintiffs' down payment to Shahabuddin was contingent on him "performing all obligations under this agreement" and additional payments were to be made to Shahabuddin "on or about July 1, 2016, contingent on delivery of executed assignment documents by Seller of the Business leases, as requested by Purchaser. Id. ¶ 2.a.-b. (ECF No. 99-9, at 2-3). In other words, Plaintiffs would not have made these initial payments to Defendant had be not performed his end of the agreement and assigned the leases Plaintiffs' requested. Because these terms are plain no resort to construction is necessary. But it bears mention that these dates are entirely consistent with the email correspondence cited above, which demonstrates the parties understood that leases to be assigned would be identified and transferred promptly.

Furthermore, the liability provisions of the PSA state Defendant is liable for "[a]ny reduction in Net Revenue sustained in any Fiscal Year by the Territories as compared to Fiscal Year 2016," which implies that transfer of assets to Plaintiffs was to occur in 2016. Otherwise, it would not make sense to use 2016 as

the comparator year.  Id. ¶ 7.d. (ECF No. 99-9, at 5).  Lastly,
the PSA contains representations and warranties, which are "deemed
to have been given upon the execution of this Agreement and upon
the Closing Date."  Id. ¶ 8 (ECF No. 99-9, at 6).  Such
representations and warranties also only make sense if the Closing
occurred in 2016. For example:

- The Seller further warrants that Seller has not received any
  notice of, and there is not existing event of default, and
  all rents due under the lease agreements are <u>current as of
  the date of Closing except for June rent</u>.  Id. ¶ 8.e.
  (emphasis added).

- If a Lessor consents to assignment, Seller's failure to assign
  such leases to Purchaser, provide leases free of [sic.] clear
  of any and all liens or failure to ensure that all rents are
  current <u>as of Closing</u>, shall render the Purchase Price void
  and no amounts shall be due or owing from Purchaser to Seller
  for the Purchase Price.  Id.

In sum, the language of the PSA repeatedly reiterates that Closing,
including the assignment of requested leases, was to occur soon
after the execution of the PSA in 2016.

In addition to the terms of the PSA itself, the parties'
communications also highlight that leases were to be assigned soon
after the execution of the PSA.  Following the execution of the
PSA, the parties repeatedly discussed assigning leases, which
leases Plaintiffs would be taking, and payment for the leases.  In
accordance with the PSA, Liberty emphasized that it would be paying
June and July rents for the locations that it had secured and not
for the locations they were <u>not taking</u> or had been unable to

27

contact the landlords to secure, again highlighting that the decision of whether or not Plaintiffs were taking properties was to be made at this time. Def.'s Br., Ex. 4 (ECF No. 88-4, at 5-7). The communications from July through November 2016 also indicate a desire to wrap up the Closing by assigning leases as soon as possible. For example, on August 22, 2016, Liberty's counsel wrote, "We are working to get these assigned as quickly as possible" and noted "I believe you'd agree that it's in all the of the parties' interest to get these assignments finalized soon." Id., Ex. 5 (ECF No. 88-5, at 1). Thus, the parties' conduct shows that they believed leases were to be assigned soon after the execution of the PSA.

The fact that Plaintiffs expected leases to be assigned in 2016 is also supported by the parties' later performance under the PSA and by the Settlement Agreement terms regarding payment due to Shahabuddin, as well as by Hewitt's Affidavit. In November 2018, the parties agreed to a settlement that superseded the PSA with the exception of certain provisions. Settlement Agreement ¶ 4.A. (ECF No. 99-10, at 4). In this Settlement Agreement, Liberty warranted that it was "not aware of any event or condition giving rise to a claim of offset against Shahabuddin pursuant to the surviving terms," which included Paragraph 8(e) that addressed the assignment of leases. Id.; see also Def.'s Br. ¶ 22 (ECF No. 88, at 7). Thus, in 2018 Plaintiffs did not believe that they had a

claim against Shahabuddin for the assignment of the Subject Locations.   This understanding is also supported by Hewitt's Affidavit in which he swore that he did not expect Shahabuddin to keep the leases for the Subject Locations "available for assignment indefinitely in the future."  Def.'s Br., Ex. 2, Hewitt Aff. ¶ 12 (ECF No. 88-2, at 2).   While Plaintiffs claim to contest the veracity of Hewitt's affidavit, they fail to produce any evidence to the contrary.   In fact, Plaintiffs produced no declaration or deposition testimony suggesting that they intended to retain the right to request assignments indefinitely, or at least until December 2019.  They simply assert that "[t]he PSA does not give a time limit as to when Plaintiffs can request the assignment of the leases at issue from Defendant."  Pls.' Opp'n (ECF No. 99, at 14); Pls.' Br. (ECF No. 108, at 8); Pls.' Reply to Response to Pls.' Mot. Summ. J. (ECF No. 115, at 12) ("Pls.' Reply").

In support of this assertion, Plaintiffs point to the language of Paragraph 8(e) of the PSA, which "without stating any time limit, . . . states that 'to the extent any leases associated with the Business have not been assigned to [Plaintiffs] and [Plaintiffs] request[] such assignment, [Defendant] agrees to assign such leases to [Plaintiffs] immediately.'"  Pls.' Opp'n ¶ 3 (ECF No. 99, at 8) (quoting PSA ¶ 8(e) (ECF No. 99-9, at 5)); Pls.' Br. ¶ 4 (ECF No. 108, at 2) (quoting PSA ¶ 8(e) (ECF No. 99-9, at 5)).   But Plaintiffs present this sentence out of context.

See <u>Erie Ins. Exch. v. EPC MD 15, LLC</u>, 822 S.E.2d 351, 355 (Va. 2019) (noting that the search for plain meaning "looks at a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of the entire agreement").  The first sentence of Paragraph 8(e) states that at Plaintiffs' request, Shahabuddin was to assign the properties listed in Schedule C.  PSA ¶ 8(e) (ECF No. 99-9, at 5).  The next sentence then states that, "<u>[n]otwithstanding the forgoing</u>, to the extent any leases associated with the Business have not been assigned to [Plaintiffs] and [Plaintiffs] request[] such assignment, [Defendant] agrees to assign such leases to [Plaintiffs] immediately."  <u>Id.</u> (emphasis added).  Thus, while Plaintiffs emphasize the lack of a time limit in this paragraph, the sentence cited by Plaintiffs appears to simply expand the properties that Plaintiffs could request from Shahabuddin beyond those listed in Schedule C.  Furthermore, a reasonable person in Plaintiffs' position would not believe that they could request assignment of leases over three years after the closing of the PSA, as Defendant would have needed to otherwise dispose of the leases that Plaintiffs were not taking or risk financial loss by holding onto such leases indefinitely.  See <u>Portsmouth Redevelopment & Hous. Auth. v. Ison</u>, 66 Va. Cir. 336, 366-67 (Cir. Ct. 2005).

Plaintiffs also attempt to establish that their timing was reasonable by explaining that they requested the leases be assigned to them after the expiration of the License Agreements in April 2020.   Pls.' Opp'n (ECF No. 99, at 17).   But, according to Brashier's own testimony, Plaintiffs already knew that Defendant did not intend to assign the lease to them after the expiration of the License Agreements.   Def.'s Br., Ex. 10, Brashier Tr. 70:5-71:6 (ECF No. 88-10, at 16-17) (noting that when they were negotiating the License Agreements Shahabuddin would not give them beyond April 30, 2020).   The fact that Plaintiffs signed License Agreements with Defendant and then requested to remain may show that Plaintiffs decided they wanted to retain access to the Subject Locations, but it does not establish that they requested assignment of the leases within a reasonable time.

Likewise, Plaintiffs' argument that they did not waive their right to assignment of the leases in question, because they sought to obtain the leases "through this lawsuit after exhausting every other means of obtaining the leases available" is unavailing. Pls.' Br. (ECF No. 108, at 8).   The other means by which Plaintiffs claim they sought to obtain the leases include: Brashier allegedly communicating with Defendant's counsel the week of the Friday, December 27, 2019 during which Defendant's counsel informed him that Shahabuddin would not assign the leases to Liberty  Id., Ex. C, Brashier Tr. 44:12-45:22 (ECF No. 108-3, at 3-4), and seeking

31

a temporary restraining order and preliminary injunction in New York state in 2020. See id., Ex. B (ECF No. 108-2). These actions, which occurred several years after Closing on the PSA do not establish that Plaintiffs did not previously waive their right to assignment of the leases at issue. Having waived their rights in 2016, Plaintiffs later requesting the leases or filing lawsuits to obtain them does not change the fact that the waiver had already occurred. Furthermore, even if Plaintiffs did not expressly waive their rights to request leases to all of the Subject Locations, they implicitly did so by not requesting the leases within a reasonable amount of time.[6]

## B. Plaintiffs Are Liable to Shahabuddin for the Difference in "Net Revenue" Accounted for by "Electronic Filing Fees."

Unambiguous contract provisions are given their plain meaning. Bell BCI Co. v. Old Dominion Demolition Corp., 294 F. Supp. 2d 807, 812 (E.D. Va. 2003) (citing Pysell v. Keck, 559 S.E.2d 677, 678 (Va. 2002)). Here, the terms of the provision in question are unambiguous. Plaintiffs' and Defendant's prior Settlement Agreement regarding payment under the PSA states that Shahabuddin is entitled to "10% of Net Revenue payable on or about July 1, 2019" and that terms not defined within the Settlement

---

[6] Because I find that Plaintiffs waived their rights to assignment of the leases explicitly and by not seeking to obtain them within a reasonable time, I do not reach the Defendant's additional arguments that Plaintiffs' rights were extinguished by their subsequent License Agreements with Defendant or that Plaintiffs failed to establish damages.

Agreement are defined by the PSA.  Settlement Agreement ¶ 1.C.
(ECF No. 99-10, at 3).  The PSA defines "Net Revenue" as, "gross
fees received less all discounts, Cash-in-a-Flash, Send-a-Friend,
and uncollected fees for the offices in the Territories."  PSA ¶
1 (ECF No. 99-9, at 2).  However, when Plaintiffs paid Shahabuddin
10% of Net Revenue on July 20, 2019, this payment did not include
$43,032.20 (or 10% of $430,322) for "Electronic Filing Fees."
Plaintiffs do not dispute this fact, but assert that they "do not
owe Defendant money pursuant to a contract for a product or service
that was not conceived of prior to entering that contract."[7]  Pls.'
Opp'n (ECF No. 99, at 22).

The plain language of the Settlement Agreement and PSA does
not support Plaintiffs' position.  The PSA excluded certain
expenses from the 10% Net Revenue calculation.  But Brashier
acknowledged that "Electronic Filing Fees" are not excluded
"discounts, Cash-in-a-Flash, Send-a-Friend, and uncollected fees."
Def.'s Br., Ex. 10, Brashier Tr. 108:14-20 (ECF No. 88-10, at 23)
("[T]hey are not cash in a flash, send a friend or uncollected
filing fees or yellow balloons.").  Plaintiffs explicitly excluded
certain expenses from the 10% Net Revenue calculation and could
have chosen to exclude fees from future products or services, but

---

[7] Plaintiffs also allege that they are entitled to withhold payment to Defendant
for damages, including those giving rise to this lawsuit.  Because Defendant
did not breach the terms of the PSA in not assigning the Subject Locations to
Plaintiffs, this argument also fails.

did not do so.   There is no dispute of fact concerning the gross fees received, as these figures were reported to Shahabuddin by Plaintiffs.   The Court declines to now add additional terms reclassifying permitted deductions from gross revenue.   <u>Nationwide Mut. Ins. Co. v. Overlook, LLC</u>, 785 F. Supp. 2d 502, 521 (E.D. Va. 2011) ("[T]he courts, when interpreting a contract, 'construe it as written and will not add terms the parties themselves did not include.'" (quoting <u>Landmark HHH, LLC v. Gi Hwa Park</u>, 671 S.E.2d 143, 146 (Va. 2009))).   The exact sum owed to Shahabuddin is readily calculable, as Liberty's own spreadsheet used to calculate Shahabuddin's Net Payment from July 1, 2018 to June 30, 2019 includes a column showing Electronic Filing Fees totaling $430,322. Def.'s Br., Ex. 9 (ECF No. 88-9, at 3). Ten percent of $430,322 is $43,032.20.   Thus, under the terms of the contract, Plaintiffs are required to pay Defendant $43,032.20, his 10% share of this previously withheld Net Revenue.

## IV.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends Plaintiffs' Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED and judgment entered in favor of the Defendant on Plaintiffs' claims, and against the Plaintiffs on Defendant's counterclaim awarding damages to Shahabuddin in the amount of $43,032.20.

## V.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days if service occurs by mail.   A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984);

<u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

_____ /s/ _____
Douglas E. Miller
United States Magistrate Judge

_____
DOUGLAS E. MILLER,
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

June 24, 2021